FREDERICKA HOMBERG WICKER, Judge.
| ¡.This breach of contract dispute concerns the failed sale of immovable property. At the heart of this controversy is whether there was a valid agreement to purchase the real estate; and, if valid whether there was an oral modification of the agreement. The trial judge concluded there was a valid agreement and that the purchasers, plaintiffs/appellants, Michael Brandner and Cynthia Brandner, defaulted on the agreement by failing to go forward with the act of sale on the date of closing, January 8, 2007. The trial judge awarded the owner, defendant/appellee, Staf-Rath, LLC (Staf-Rath), $56,500, in interest, costs, and attorney’s fees. He *814 dismissed the plaintiffs’ case-in-chief. We amend the judgment, and as amended affirm.

Facts

lain 2006, Staf-Rath owned a large warehouse-like structure located at 5504 South Lambert Street in Harahan, Louisiana (the Property). Raymond Rathle was the managing member of the firm. At that time, Mr. Rathle’s company, Carnival Brands, Inc., a food processing company, leased the Property from Staf-Rath on a monthly basis. In October 2006, after Hurricane Katrina, Staf-Rath decided to sell the Property.
After the hurricane, Mr. Rathle repaired the building and obtained a conditional use to operate Carnival Brands once again from the United States Department of Agriculture. The company needed an approved USDA facility. But Mr. Rathle could not get regular workers. Thus, he decided to sell Carnival Brands, its inventory, as well as the building.
Carnival Brands’ assets consisted of two freezers (with separate lines), a walk-in cooler, a free-standing cooler, movable fixtures, stainless steel tables, two kettles, pallet racks that contained dry storage materials, bags, boxes, desks, file cabinets, pots, and pans. Carnival Brands also used food processing equipment that was installed in the building. The processing equipment consisted of a cooker, a freestanding sink and tank, a chill bath with water to chill down food, and an outside boiler with a natural gas coupling. At the time that Mr. Rathle purchased the processing equipment and placed it in the building for Carnival Brands, he required the services of a licensed electrician, a licensed plumber, a certified welder, and a general contractor. Mr. Rathle estimated the removal of the processing equipment, including capping off lines, could take a week to three months. He estimated it would cost $25,000 to remove and transport the equipment and $50,000 to hook it up elsewhere.
Michael Brandner, who owned nearby property, was interested in purchasing the Property as an investment; he was not interested in operating the food ^processing business. Also, he wanted the processing equipment and inventory removed before closing. He and his wife, Cindy Brandner, signed an offer to purchase the Property on October 3, 2006. Robert M. Israel, Staf-Rath’s realtor, and Kathleen Brandner (Ms. K. Brándner), the Brandners’ realtor, assisted the parties in the sale negotiations.
Mr. Israel, as the seller’s agent, signed accepting the October offer on or about October 3 or 4, 2006. On October 3 and 4, 2006, the Brandners tendered the deposit by check and promissory note, respectively. Mr. Rathle signed the offer (as altered and initialed by him in two respects) on October 5 and October 6, 2006.
The offer contained a “removal” provision that required the seller to remove certain items, including the food processing equipment, prior to the act of sale:
Prior to the act of sale, Seller shall remove all movable furniture, fixtures and equipment at the seller’s expense per the Carnival Brands Partial Asset Inventory Report as of 6/1/05 attached hereto, and shall remove the coolers and refrigeration equipment and partitions per the property plan labeled “Exhibit A.” All electrical, gas and/or plumbing lines that fed said equipment and fixtures to be removed and shall be capped in a professional and workmanlike manner per all applicable codes.
The closing for the act of sale was set for January 8, 2007. On January 8, the processing equipment had not been removed.
*815 From mid-November 2006 until the weekend before the closing, however, the Brandners were negotiating a lease with Pigeon Catering, Inc. (Pigeon) through its principal J.P. Pigeon.
Mr. Pigeon, Mr. Rathle’s friend, had been in business for 11 years. His equipment supplier told him about Mr. Rathle’s newspaper advertisement to sell food processing equipment. He contacted Mr. Rathle and offered to purchase the equipment. Mr. Pigeon was also interested in purchasing the building and using the equipment located there. The building had a USDA certification, a valuable 15asset. At the time, Mr. Pigeon operated a restaurant-style kitchen that was not USDA certified. The USDA certification piqued his interest in the building. Mr. Rathle, however, informed Mr. Pigeon that the building was already under contract. But he informed Mr. Pigeon that the purchaser might be interested in leasing the property to Mr. Pigeon. Later, on December 22, 2006, Mr. Pigeon purchased Carnival Brands’ assets. Mr. Pigeon testified that he purchased the assets while also negotiating a lease with the Brandners intending for the processing equipment to remain in the building. He stated that “everyone involved understood that this was critical to the [lease] deal [with the Brandners].”
Mr. Rathle testified that if he were to undertake the daunting task of removing the integral processing equipment from the building during the lease negotiations, he would undermine Mr. Pigeon’s plans for operating his business.
Unfortunately, although all parties anticipated a lease agreement before the closing on the sale of the Property, all lease negotiations abruptly ended on the Saturday before the Monday closing when Mr. Pigeon withdrew. The parties, including Mr. Pigeon, proceeded to the act of sale on January 8, 2007. At the closing, Staf-Rath tendered title, and the Brandners, through their attorney, Mr. Raymond Landry, rejected the tender although the purchasers had the funds available to proceed with the transaction. Mr. Brandner relied on the “removal” provision and did not purchase the property because processing equipment remained in the building. According to Ms. K. Brandner, the Brand-ners’ realtor, the term, “equipment,” included the “partitions” as well.
Mr. Israel testified that he returned the Brandners’ cash portion of the deposit. Mr. Rathle stated that he attempted to salvage the sale and that the removal process was completed by January 19. Negotiations between the Brandners and, Mr. Rathle after January 8 failed.
|fiThe agreement to purchase provided for specific performance or alternatively damages, attorney’s fees, and costs in the event of failure to comply with the agreement within the time specified. After the failed sale, the Brandners filed suit against Staf-Rath alleging that Staf-Rath defaulted by failing to remove the processing equipment before closing. Staf-Rath in turn filed a reconventional demand alleging that the Brandners were in default for failing to go forward with the sale.
In addition to finding a valid agreement, the trial judge concluded that there was an oral modification of the “removal” provision of the agreement based on lease negotiations between the Brandners and Mr. Pigeon, which showed the intent for the processing equipment to remain in the building.

Analysis

The crux of the Brandners’ case on appeal is that there was no valid contract, i.e. a meeting of the minds; and, even if valid, then Staf-Rath breached the contract. Appellants also assert that in the event the *816 Court finds a valid contract, the contract expired on its own terms when no act of sale occurred. Finally, if valid, they seek damages under the contract.
In addressing appellants’ arguments, we consider the basic precepts concerning the contractual requirements of an agreement to purchase immovable property.
A contract is formed by the consent of the parties established through offer and acceptance. La.C.C. art. 1927. A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La.C.C. art. 1906. An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer. La.C.C. art. 1943.
|7A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates. La.C.C. art. 2623. A sale or promise of sale of an immovable must be made by authentic act or by act under private signature, except as provided in Article 1839. La.C.C. art. 2440.
Sale is a contract whereby a person transfers ownership of a thing to another for a price in money. La.C.C. 2439. The thing, the price, and the consent of the parties are requirements for the perfection of a sale. Id.
An option to purchase an immovable must be evidenced in writing. La. C.C. art. 2440. A contract to purchase and sell real estate is not valid unless given in writing and an extension of the time stipulated for passage of title to property in a written contract to purchase and sell real estate must also be in writing. Harrell v. Stumberg, 220 La. 811, 57 So.2d 692, 694. In accordance therewith, it is well settled that parol evidence may not be used to establish title to immovables. Blevins v. Manufacturers Record Pub. Co., 235 La. 708, 105 So.2d 392, 414 (La.1957) (citations omitted).[1]
Thus, when the use of parol evidence is not for the purpose of establishing title to immovables,[2] parol evidence may be admitted in the interest of justice to prove a modification of a written act by a subsequent and valid oral agreement. La.C.C. art. 1848.[3] Mooers v. Sosa, 01-286 (La.App. 5 Cir. 9/25/01), 798 So.2d 200, 206 (citations omitted).
| sAIthough parol evidence is inadmissible to vary the terms of a written contract, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity and to show the intention of the parties. McCarroll v. McCarroll, 96-2700 (La.10/21/97), 701 So.2d 1280, 1286 (La.1997) (citation omitted). If the terms of a written contract involving real estate are ambiguous or if the intent of the parties is an issue, *817 parol evidence can be used to enforce the terms of such an agreement rather than invalidate or destroy the contract. Drachenberg v. Parish of Jefferson, 563 So.2d 528, 525 (La.App. 5 Cir.1990) (citation omitted; internal quotations omitted).
The question of ambiguity in a contract is one of law. River Oaks, Inc. v. Blue Cross of Louisiana/Louisiana Health Service & Indem. Co., 595 So.2d 785, 788 (La.App. 5 Cir.1992), writ denied, 598 So.2d 361 (La.1992) (citation omitted). However, when the interpretation of the contract is based upon factual findings, such as intent, then the issue is subject to a review for manifest error. Id.
The determination of the existence of a contract is a finding of fact, not to be disturbed unless clearly wrong. Color Stone Intern., Inc. v. Last Chance CDP, LLC, 08-35, pp. 5-6 (La.App. 5 Cir. 5/27/08), 986 So.2d 707, 712 (citations omitted). An appeals court may not set aside a trial court’s ruling as to the existence or non-existence of a contract in the absence of manifest error. Id.

Preclusion Argument

Among other things, Staf-Rath asserts that the appellants cannot claim for the first time on appeal that there was no valid purchase agreement.
The Brandners’ argument that there was no valid agreement is based on the introduction at trial of various versions of the purchase agreement and alleged | ^accompanying attachments, which both parties introduced at trial.[4] Although the Brandners did not raise the issue of whether there was a binding agreement until their motion for new trial, the pleadings were enlarged during the trial[5] and the trial judge, in deciding the motion for new trial specifically clarified that he had found that there was a sales agreement agreed upon by all parties. Therefore, the trial judge evidently considered that the issue was properly before him since various versions of the agreement were introduced into evidence by both parties. Thus, the question of which version, if any, was binding was squarely before the trial judge and the court did not have to unilaterally divine a defense not previously raised. Accordingly, we conclude that the validity of the agreement is properly before this court.
Now, in light of the various versions introduced at trial, we turn to the issue of whether there was a valid and enforceable purchase agreement.

The Agreement

At trial, the parties introduced a joint exhibit, which was a copy rather than an original purchase agreement. The two-page purchase agreement (the “Agreement”) contained the signatures of both parties. Despite having no original purchase agreement that contained the signatures of both parties, it was undisputed that the two-page Agreement in large part constituted the agreement by the purchasers and seller. Thus, we are unpersuaded by appellants’ argument that simply because various versions of the Agreement *818 were introduced at trial, there was no binding agreement.
|inWe now turn to appellants’ argument that there was no meeting of the minds because Mr. Rathle’s alterations of the Brandners’ signed two-page Agreement constituted Mr. Rathle’s counteroffers that the Brandners never accepted.
The two contract provisions that lie at the heart of the dispute as to the validity are a “removal provision” and a provision setting the date for the act of closing. These two provisions are ambiguous and the judge properly relied on parol evidence to show the intent of the parties given that the evidence was not used to establish title to the immovable. See: Drachenberg, supra; Blevins, supra.

Closing Date

Unquestionably Mr. Rathle, who signed the Agreement on October 5 and 6, 2006, admitted that he altered the wording on the Agreement that the Brandners signed on October 3, 2006 and submitted to him. By a handwritten initialed notation, he offered to extend the closing date an additional 15 days, i.e., from 30 days to 45 days after the expiration of the 45-day “Contingency Period.” The Agreement that the Brandners signed set the closing date at 30 days after the expiration of the “Contingency Period.”[6] The Agreement further specified that the “Contingency Period” was 45 days “after the acceptance of this Agreement by all parties.” Thus, Mr. Rathle offered to close 90 days after all parties “accepted” the Agreement, while the Brandners’ original offer to close was 75 days after “acceptance.”
The term “Contingency Period” is ambiguous because it does not define what constitutes “acceptance [of] the agreement by all parties.” The closing date set forth in the Agreement is confusing especially in light of the fact that the Brandners and Mr. Rathle signed the Agreement on different dates and Mr. Rathle |n signed twice: first on October 5, 2006 and again on October 6, 2006. The Agreement does not specify whether the period began to run from the date the parties mutually accepted the Agreement or rather from either the earliest or the latest date that either party signed the Agreement. It is also unclear whether the time ran from the date of Mr. Israel’s signature, who as the seller’s agent, signed accepting the Brand-ners’ offer on or about October 3 or 4. If the closing date ran 75 days from the latest date of signature, the original closing date was December 20, 2006. However, in her e-mail of November 8, 2006, Ms. K. Brandner (the Brandners’ realtor) wrote to Mr. Israel (Mr. Rathle’s realtor) that she calculated the closing date to run from October 4, 2006. She testified she thought the closing date was January 2, 2007 (90 days after “acceptance”). She stated that she asked Mr. Landry, the Brandners’ closing attorney, about his appreciation of the closing date and whether they could extend it to January 8 because the Brandners were out of town. She also asked Mr. Landry whether they needed an addendum to the Agreement to extend the date. According to Ms. K. Brandner, Mr. Landry told her an addendum was unnecessary for such a short period.
The October 4th date was the date next to Ms. K. Brandner’s signature on the second page of the two-page Agreement. October 4th was also the date that the Brandners tendered the promissory note as a deposit, having tendered the cash portion on October 3rd. Mr. Israel testi *819 fied that the Agreement signed by the Brandners was given to Mr. Israel to present to Mr. Rathle to accept on or about October 3 or 4.
According to Ms. K. Brandner’s November 8, 2006 e-mail to Mr. Israel, the original closing date ran 90 days after October 4, 2006. Previously, on October 4, 2006, Mr. Israel sent a cover fax with the Agreement to Ms. K. Brandner, which Ms. K. Brandner acknowledged receiving and which read:
112Katie [Ms. K. Brandner], please note I added 15 days to closing date and seller will not remove added walls by purchaser. Ray [Mr. Rathle] met with his equipment guy today and he told him it could take at least 60 days to move everything. Thanks, Robert.
On November 8, 2006, Ms. K. Brandner responded to Mr. Israel by e-mail stating:
I talked to Mike and he would prefer to keep the 90 days as we planned. So that should be 90 days from October 4th.
Thus, through her written communication, Ms. K Brandner stated that the parties agreed that the closing would take place 90 days from October 4th. Although Mr. Brandner testified that he was unaware of Mr. Israel’s fax, Ms. K. Brandner testified that anything she received from Mr. Israel, she showed the Brandners.
Mr. Brandner testified that Mr. Rathle asked him for 90 days but Mr. Brandner only agreed to give him 60 days. The Agreement that Mr. Brandner signed sets the delay as 75 days and not 60. Mr. Brandner believed that the 60 days went beyond or right at the closing. But, Mr. Brandner also testified that he thought they had increased the days from 30 to 45 (Mr. Rathle’s initialed change). He did not recall because he did not have the Agreement in front of him. When asked whether he also agreed to extend the closing deadline, he replied that everybody agreed that the closing would be January 8.
Our review of the record reveals that the parties intended the 90 days to run after the “acceptance” date of October 4th. Since Mr. Rathle had altered (and initialed) the closing date by extending it 90 days from “acceptance,” there was a clear meeting of the minds as to the closing date.
Furthermore, Ms. K. Brandner and Mr. Brandner testified that the closing date selected was agreed upon by all the parties. Ms. K. Brandner stated that after she calculated the initial closing date, the date was extended a few days from | ^January 2nd to Monday, January 8th because the Brandners were out of town and there were other scheduling conflicts.
In written documents, before the January 2nd deadline, the parties confirmed that the closing date was again extended to January 8, 2007 or late January 2007.
On December 26, 2006, Ms. K. Brandner sent an e-mail to Mr. Israel (Mr. Rathle’s realtor) stating in part:
I wanted to know what the status of the lease was. Mike and Cindy are leaving to go out of town for a week tomorrow. Does it need to be singed [sic] before they leave or can they sign it when they come back? It is still my understanding that the tentative closing os [sic] on Monday the 8th. Is that your understanding?
Mr. Israel did not respond by e-mail to Ms. K. Brandner’s question about the closing date. However, on December 22, 2006, Mr. Rathle signed an agreement to sell certain assets of his company, Carnival Brands, to Pigeon effective January 1, 2007. The contract contained a section concerning the purchaser’s responsibility to move the transferred property:
*820 Vendor and Purchaser recognize that the facility at the Municipal Address stated above [the Property] where the equipment is located may be sold by the end of January, 2007 and, that, if Purchaser herein is not the purchaser of the immovable property at the aforesaid Municipal Address, Purchaser shall have the sole responsibility to move the Property transferred herein at his expense should Purchaser not agree to lease or buy the facility from the new owner.
Thus, there is a writing evidencing Mr. Rathle’s agreement to extend the closing date to as long as late January.
Moreover, there was a written e-mail communication on January 4, 2007 from Ms. K. Brandner to Mr. Israel stating: “I told the Brandner’s [sic] and Raymond [Landry] that we would like to have everything done [the lease] and signed by all parties by tomorrow evening as the closing is on Monday [January 8th].
1 uMr. Israel responded to Ms. K. Brand-ner that date by e-mail that his draft of the Pigeon lease provided that the lease started on January 15, a week after the closing. Thus, both before the expiration period of January 2nd and thereafter, the parties evidenced in writing an agreement to extend the closing date.
Accordingly, we find no error on the part of the trial court in concluding there was a meeting of the minds and a valid agreement.

“Removal” Provision

There are two aspects to the “removal provision.” The first portion refers to the removal of “all movable furniture, fixtures and equipment at the seller’s expense” per an inventory report “attached hereto.” The second portion (at issue here in appellants’ challenge to the validity of the contract) mandates the seller’s removal of “the coolers and refrigeration equipment and partitions per the property plan labeled ‘Exhibit A.’ ” Unlike the inventory report, the provision does not state that ‘Exhibit A’ is attached.[7]
At trial, the parties introduced different purported attachments to the Agreement.
According to Ms. K. Brandner, the Brandners’ realtor, she and Rich Stone added Lines 37 through 41, a “removal” provision, to page 1 of their prepared form Agreement.
| )5We note that those lines referred to “Exhibit A.” All versions of the Agreement introduced at trial contained the following “removal” provision (emphasis in original):[8]
Prior to the act of sale, Seller shall remove all movable furniture, fixtures and equipment at the seller’s expense per the Carnival Brands Partial Asset Inventory Report as of 6/1/05 attached *821 hereto, and shall remove the coolers and refrigeration equipment and partitions per the property plan labeled “Exhibit A.” All electrical, gas and/or plumbing lines that fed said equipment and fixtures to be removed and shall be capped in a professional and workmanlike manner per all applicable codes.
According to Mr. Brandner, the offer had one attachment; namely, the property’s interior floor plan identifying the partitions that Mr. Brandner wanted Mr. Rathle to remove prior to the act of sale. In contrast, Mr. Rathle identified two attachments: a floor plan diagram and an inventory list. Mr. Rathle stated that the partial inventory list comprised the Carnival Brands Partial Asset Inventory Report, which he approved. He explained that these were fixtures in the building and not part of the structure. The parties do not dispute the inventory’s accuracy.
At trial, the parties identified a different version of the floor plan diagram that they respectively approved. In essence, Mr. Brandner testified that he approved the diagram indicating that certain partitions needed to be removed by the seller while Mr. Rathle identified a diagram that eliminated that requirement. Neither of these diagrams contained the initials of both parties. Mr. Rathle’s purported diagram only contained his initials while Mr. Brandner’s purported diagram contained none. Further, Mr. Brandner testified he did not know who had drawn arrows on the diagram he approved referencing the partitions.
hfiln contrast to their trial testimony, both parties submitted affidavits in connection with a motion for summary judgment wherein each identified the other party’s trial version of the diagram as the correct one. The affidavits were introduced into evidence at trial without objection. Mr. Brandner’s affidavit was introduced jointly in the bench book while Mr. Rathle’s affidavit was introduced by the Brandners’ counsel. At trial, Mr. Brandner and Mr. Rathle testified that their affidavits were incorrect with respect to the prior identification of the diagram.
Thus, Mr. Brandner’s testimony at trial was inconsistent with his pretrial affidavit. Likewise, Mr. Rathle’s testimony at trial was also inconsistent with his pretrial affidavit in the same respect.
The term “partitions” is ambiguous[9] because it is not defined in the Agreement. The Agreement is also ambiguous because the words “per the property plan labeled ‘Exhibit A’ ” are insufficient to incorporate any “Exhibit A” identified by the parties. We note, however, that although there was disagreement regarding the meaning of the term, Mr. Rathle did not strike any mention of the word “partitions” from the “removal” provision on the first page of the Agreement that he signed. Therefore, there was a meeting of the minds and a valid contract between these parties such that the parties agreed that before closing the “partitions” would be removed.
Since the Agreement, however, did not define “partitions,” the trial judge properly considered parol evidence to determine the intent of the parties in that regard. In doing so, the trial judge found that there was an oral modification of the Agreement where the parties agreed that removal of any items was suspended and did not have to be completed prior to closing during the Pigeon lease negotiations. |i7For the reasons that follow, we find no manifest error in the trial judge’s finding that there was *822 an oral modification of the “removal provision.”

Lease Negotiations

It is undisputed that there was no written modification of the “removal” provision. Staf-Rath argues, however, that the “removal” provision was modified by virtue of the lease negotiations, which made it impossible to remove the items since the lessee would not otherwise lease the Property. Thus, removal of the equipment would impair the lease negotiations.
While it is undisputed that there was no lease agreement between Pigeon and the Brandners, the evidence and testimony introduced at trial overwhelmingly supports the trial judge’s determination that the parties anticipated a lease agreement between the Brandners and Mr. Pigeon before the closing.
Prior to closing, Mr. Israel and Ms. K. Brandner exchanged several e-mail communications discussing the terms of a potential lease of the Property between the Brandners and a tenant. At first, in late October 2006, Mr. Israel proposed that the Brandners sell their contract because a potential tenant had inquired about that possibility. The Brandners, however, rejected the $50,000 offer to sell their contract.
On November 13 and 15, 2006, Ms. K. Brandner sent e-mails to Mr. Israel indicating that Mr. Brandner preferred that the tenant purchase the equipment and remove the equipment as well as perform repairs upon expiration of the lease. The November 13 e-mail stated:
I spoke with Mike. He is interested but is hesitant on only doing a 1 yr lease. He would like to do a longer one ... Also, he wants to make sure that the tenant will be buying the equipment from Raymond [Rathle] and at the end of the lease term will take the equipment with him and repair all damages, etc., as Raymond [Rathle] would be doing now. Let me know what you think.
11sThe November 15th e-mail stated:
I am doing everything on my end to have this work out as well. Mikes [sic] big concern was the equipment. But if the tenant buys it from Raymond [Rathle] and we make sure that in the lease the equipment goes with the tenant and the tenant repairs any damage done to the property, capping off lines, etc. with the removal, I know Mike would go for it. Also if we can do the lease together that would be great as well. Just let me know what he says and I will get the information to Mike. I will keep my fingers crossed that it works out.
Before the closing, Mr. Rathle and Mr. Brandner discussed the potential tenant. According to Mr. Brandner, he advised Mr. Rathle that Mr. Rathle would be taking a risk because Mr. Rathle still had the obligation to remove the equipment by the time of closing. However, Mr. Brandner also testified that when Mr. Rathle approached him about the potential tenant, he responded, “okay.” According to Mr. Rathle, Mr. Brandner confirmed that Mr. Rathle did not have to remove the equipment because of the potential tenant.
Based on that conversation, Mr. Brand-ner testified that he canceled his appointment with his contractor, Roger Obano of Alternate Construction, who had been scheduled to perform renovations of the Property. Mr. Brandner stated that scheduling such work was a challenging task given the post-Hurrieane Katrina climate.
On December 22, 2006, Mr. Israel prepared a draft of the lease that Mr. Pigeon signed. At the time, Mr. Israel believed that he had received all of the anticipated comments from Mr. Brandner. However, *823 Ms. K. Brandner, with whom he had been communicating through e-mail, was also communicating with Mr. Landry, the Brandners’s attorney. Although Ms. K. Brandner testified that she forwarded Mr. Landry’s comments concerning the proposed lease, Mr. Israel never received those. Mr. Pigeon believed that the lease agreement was final when he signed it on the 22nd. On that day, Pigeon Catering purchased most of the assets |19from Carnival Brands. Some of the equipment Pigeon purchased required dismantling and/or disconnection upon removal.
Mr. Rathle testified that based on the emails, he believed that the lease was complete then. Based on that belief, Mr. Rathle sold his equipment to Mr. Pigeon that day. Mr. Rathle explained that if Mr. Pigeon had declined the offer to purchase the equipment because he did not think he had a lease, Mr. Rathle stated he would have begun removing the equipment from the Property. According to Mr. Rathle, on that date, he still had time to remove the equipment.
Mr. Pigeon testified that he purchased the equipment with the understanding that he would be able to leave the equipment in the building and operate his business. Ms. K. Brandner agreed that it would have made no sense to remove the equipment, conduct inspections, sign a lease, and then require the tenant to bring his equipment back in. She agreed that it was possible that the tenant might have decided he did not want the building had the equipment been removed. Ms. K. Brandner agreed that 3 1/2 weeks or so after the Agreement was signed, she stopped having discussions and e-mails with Mr. Israel about the removal of the equipment because at some point she believed it was not going to be necessary.
Mr. Pigeon moved into the building and started familiarizing himself with Carnival Brand food processing. The act of sale of the equipment provided that it was Mr. Pigeon’s responsibility to remove the equipment. According to Mr. Rathle, Mr. Pigeon was interested in buying the company, Carnival Brands. In January, after the lease occurred, Mr. Pigeon would purchase the company.
In addition to Mr. Israel, who acted on behalf of Mr. Pigeon, Mr. Pigeon’s lawyer, Mr. Randy Opotowsky,[10] was also involved in the lease negotiations. Mr. Opotowsky and Mr. Landry (the Brandners’ attorney) exchanged e-mail | ^communications concerning the lease. Finally, on January 6, 2007 at 11:37 AM, Mr. Opotowsky testified that he believed from e-mail communications with Mr. Landry that there was at least an agreement in principle between himself and Mr. Landry as to what the lease was going to say. Mr. Landry testified that he too believed there was a lease that the respective attorneys were comfortable recommending to their clients to sign.
On January 5, 2007 in connection with the anticipated lease of the Property, the Brandners through their LLC company signed a two-year lease document commencing on January 1, 2007 with a renewal option. Mr. Landry testified that the purpose of signing the lease was that they thought this was the final version of the lease to go forward on Monday.
The document had signature lines for Pigeon as lessee. That document also had a provision specifying the manner in which the lessee’s property would be handled in the event of default and at the termination of the lease, including the lessor’s ownership of the property following default. The proposed lease did not expressly refer *824 to the Carnival Brands’ assets acquired by Pigeon. As previously noted, the assets included the food processing equipment. On January 6, 2007 Mr. Landry agreed to a proposed addendum to the Agreement (submitted on behalf of Staf-Rath), which addressed the Carnival Brands’ assets to state in pertinent part: “[T]he parties hereto agree that the Agreement to Purchase or Sell is hereby amended to allow those assets purchased by Pigeon Catering, Inc., the Lessee from Seller, to remain on the Property and that Seller’s Obligations under the Agreement to Purchase or Sell are deemed satisfied as modified herein[.]” The addendum was never signed.
Attorney Ashley Belleau, who drafted the addendum on behalf of Staf-Rath, testified that she prepared this addendum to memorialize the agreement by the | nparties that Pigeon had purchased the equipment from Carnival Brands and the equipment was going to remain because Pigeon was leasing the property from the Brandners.
The negotiations, however, broke down on January 6, 2007 about an hour after the 11:37 AM anticipation of an imminent lease. Mr. Opotowsky sent an e-mail to Mr. Landry advising him that Mr. Pigeon was rethinking the lease and the space it provided. Mr. Opotowsky advised Mr. Landry through that e-mail that Mr. Pigeon was withdrawing any prior offer. All negotiations ended at 7:17 PM on the Saturday night before the Monday closing when Mr. Opotowsky sent an e-mail to Mr. Landry advising him that Mr. Pigeon decided not to lease the building. Mr. Brandner testified that until approximately 7:17 PM that Saturday night, he had expected that there would be a lease agreement with Pigeon.
Mr. Rathle testified that he was aware of the breakdown in lease negotiations for the first time on Friday at 3:00 PM.
Mr. Pigeon stated that he appeared on the date of closing for the purpose of honoring the December 22 lease that he had previously signed.
Mr. Brandner stated that he showed up at Mr. Landry’s office on January 8, 2007 because they were obligated and bound by the contract to appear and they were ready to complete the transaction. However, he did not purchase the property that day because the equipment was still in the building. He also testified that he did not care about the lease. He wanted to purchase the building. He stated that he later learned that the lease reduced the building’s appraised value.
In an attempt to resolve matters, Ms. Belleau prepared an addendum to the Agreement the day of closing. This addendum was never signed. It proposed allowing Pigeon 60 days to remove the assets it purchased. It also provided that LaPigeon might not enter into a lease agreement and that Staf-Rath’s obligation under the “removal” provision of the Agreement was modified.
Ms. Belleau explained that because of the anticipated lease, the parties had already agreed that the items need not be removed. At the closing, Mr. Pigeon said that he was ready and willing to go forward and lease the Property so therefore the agreement to leave the assets in the property would have still been applicable.
In this case, the trial judge appropriately relied on parol evidence to find that there was an oral modification of the “removal provision” through implication by the parties’ actions. See: Aqua Pool Renovations, Inc. v. Paradise Manor Community Club, Inc., 04-119, pp. 5-6 (La.App. 5 Cir. 7/27/04), 880 So.2d 875, 880 (citation *825 omitted) (Modification of a written agreement can be presumed by silence, inaction, or implication.). The parol evidence was not used for the prohibited purpose of establishing title to immovables. See: Blevins, supra.
Here, there was an oral modification of the agreement to purchase in that Mr. Rathle was freed from the obligation of removing the items prior to the act of sale. It is inherent in the actions of the parties that Mr. Rathle, although not fully relieved of his obligation to remove the items, would be given a reasonable time in which to remove them. This is evident by the fact that the Brandners contemplated that if a lease had been executed, the lessee, Pigeon, would have been required to remove these items at the expiration of the lease, which was certainly longer than the time between the date of the agreement to purchase and the closing. Moreover, the ongoing lease negotiations and the potential of a lease made it impossible for Mr. Rathle to remove the equipment on the eve of closing. Accordingly, we find no manifest error in the trial judge’s factual findings.
Finally, appellants argue that the deal was dead on January 8 and that any arguments on the part of Staf-Rath that the Brandners breached the Agreement by | ¡^failing to close after January 19th when the equipment was removed is baseless. Since we find no error in the trial’s judge’s finding that the breach occurred on January 8, this issue is moot.

Defective Judgment

Staf-Rath filed two reconven-tional demands in this case against the Brandners and Ms. K. Brandner, respectively. The judgment simply renders judgment in favor of Staf-Rath “on its reconventional demand” without naming the party cast in judgment. A final ap-pealable judgment must name the party against whom the ruling is ordered. Input/Output Marine Systems Inc. v. Greatbatch, et al., 10-477, p. 13 (La.App. 5 Cir. 10/29/10), 52 So.3d 909, 916, citing Johnson v. Mount Pilgrim Baptist Church, 05-337, p. 3 (La.App. 1 Cir. 3/24/06), 934 So.2d 66, 67. The failure to name any defendant against whom the judgment was rendered in a case with multiple defendants makes the judgment fatally defective, because one cannot discern from its face against whom the judgment may be enforced. Id.
This matter proceeded with a bench trial on the Brandners’s main demand and Staf-Rath’s reconventional demand against the Brandners. Staf-Rath’s counsel informed the court at trial that the parties had settled the incidental actions. Therefore, Staf-Rath and the Brandners were the only parties before the court.
We conclude, however, that the judgment sufficiently contains the necessary essentials to determine the rights of the parties. Although the judgment does not refer to the specific reconventional demand for which judgment is granted, and it does not name the defendant-in-reconvention by name, that is the only defendant remaining in this case and the only reconventional demand that proceeded to trial. Furthermore, we ascertain the name from the caption on the judgment. Therefore, there is no need to remand this matter for entry of a new judgment and we maintain | ^this appeal. See: Borg-Warner Acceptance Corp. through Borg-Warner Leasing v. Whitlow Truck Center, Inc., 508 So.2d 857, 859 (La.App. 5 Cir.1987) where this Court amended the judgment to include the name of the defendant cast in judgment.
However, in the interest of judicial economy, it is necessary to amend the trial court judgment in order to insert language naming the proper party against whom judgment is cast. Accord: Hammonds v. Reliance Insurance Company, 06-540 (La. *826 App. 1 Cir. 12/28/06), 2006 WL 3813719, *1 (unpublished).

Conclusion

After a thorough review of the record, we find no error of law or manifest error in the factual conclusions reached by the trial judge. For the reasons stated, we amend the December 15, 2009 judgment to state:
IT IS ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of defendant, Staf-Rath, LLC, on its reconventional demand against the plaintiffs, Michael Brandner and Cynthia Brandner, in the amount of $56,500, plus judicial interest from January 26, 2007, plus costs including expert fees in the amount of $6937.50, as well as reasonable attorney’s fees, in an amount to be set by this Court following a hearing on that issue. Judgment is also rendered in favor of the defendant, Staf-Rath, LLC as to the plaintiffs’, Michael Brandner and Cynthia Brandner’s case-in-chief, which is dismissed with prejudice.
And, as amended, we affirm the December 15, 2009 judgment.

AMENDED, AND AS AMENDED AFFIRMED.

. But see La.C.C. art. 1839, which states in part:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.

. See note 1, supra.

.Article 1848 provides:
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.

. The parties introduced Joint Exhibit 1. They introduced other versions as follows: The Brandners introduced without objection P-1, a different version of "Exhibit A” attached to Joint Exhibit 1; P-4; and, P-3. Although Staf-Rath objected to P-3 on the grounds it was irrelevant, Staf-Rath later introduced into evidence, without objection, a virtually identical document as D-l. Staf-Rath also introduced D-3, without objection.

. La.C.C.P. art. 1154 states that "[wjhen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading.”

. This date, however, could be extended for title curative action as provided in the Agreement but not pertinent here.

. Mr. Rathle described his equipment as consisting of two freezers, a cooker, movable fixtures, stainless steel tables, a couple of kettles, some pallet racks containing dry storage materials, bags, boxes, desks, file cabinets, pots and pans. In addition, the processing rooms had a freestanding sink, a chill bath, and a freestanding tank in the middle of the room that contained chilled water. He stated that at the time he purchased the equipment and placed it in the building for Carnival brands, he used the services of a licensed electrician, a licensed plumber, a certified welder, and a general contractor. He stated that he probably told Mr. Israel that it could take as long as 60 days to remove the equipment but he recalled a contractor told him it would take possibly a week or two. He testified that in dealing with the Brandners, he asked for 90 days in an abundance of caution in the event there were complications.

. The statement: "Seller shall repair all wood and iron fences attached to the property” was stricken through. Next to that strikeout, were Mr. Israel’s, and the Brandners's initials. The parties do not disagree that the "repair” portion of the Agreement was stricken.

. Mr. Rathle also indicated in his testimony that the walls of the freezers acted as partitions.

. The witness is also referred to in the transcript as "Opitowski.”